Senior Judge CAMPANELLA,
concurring.
While I agree with the majority that the defense of duress did not apply under the facts of this case, I do not rule out the possibility that an accused’s suicidal compulsion could be the basis of the defense of duress. Hayes, 70 M.J. at 461-63. While the majority points to lack of mental responsibility as the “appropriate defense,” a soldier with suicidal ideations would need to suffer from a severe mental disease or defect and be unable to appreciate the nature or quality or the wrongfulness of his acts for the defense of lack of mental responsibility to apply. Not all who contemplate suicide are suffering from mental illness or do not understand the nature of their actions. This is precisely why lack of mental responsibility should not be the sole defense available in the unique military environment and context in which this issue could arise. The defense of duress allows an individual to avoid liabil *820 ity “because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present.” Dixon v. United States, 548 U.S. 1, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006) (internal citations and quotations omitted). Accordingly, like our superior court, I “do not foreclose the possibility of a duress defense in the context of a suicide threat as a matter of law.” Hayes, 70 M.J. at 463.
Judge WOLFE concurring.
Article 85(a)(1)-(3), UCMJ, lists three types of desertion. The first paragraph sanctions those who leave then’ unit with the intent to remain away permanently. The second paragraph prohibits quitting one’s unit with the intent to avoid hazardous duty or to shirk important service. Appellant was charged with both of these offenses and convicted of the latter.
The third paragraph of Article 85(a), UCMJ, states “any member of the armed forces who ... enters any foreign armed service except when authorized by the United States [ ] is guilty of desertion.”
As appellant left his unit without authority and enlisted in a foreign army, the third paragraph of Article 85(a) appears to be tailor made for appellant’s conduct. However, in 1954, the Court of Military Appeals held that when passing Article 85(a)(3), UCMJ, “Congress did not intend to create a new and separate offense, but merely sought to perpetrate a rule of evidence.... ” United States v. Johnson, 5 U.S.C.M.A. 297, 301, 17 C.M.R. 297, 301 (1964).
The reasoning in Johnson—which focused on the absence of legislative history indicating an intent to amend Article 85, UCMJ—is inconsistent with the CAAF’s current cannons of statutory interpretation. In United States v. Sager, 76 M.J. 158, 161 (C.A.A.F. 2017) the CAAF reiterated:
The Supreme Court has stated time and again that courts presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first cannon [of statutory interpretation] is also the last: judicial inquiry is complete.
While I note this issue, I leave it to my superior court to determine whether the holding in Johnson should be revisited. Accordingly, I understand that under Johnson, Article 85(a)(3), UCMJ, is a codified rule of evidence that allows the factfinder to infer a criminal mens rea to prove an Article 85(a)(1) or (2) offense from an accused’s enlistment in a foreign army.[10]
Applied to this case, I accept the inference that appellant, knowing his unit would deploy in the meantime, intended to shirk important service when he enlisted in a foreign army for five years. Recognizing that the. trial court saw and heard the evidence, I therefore find the evidence factually sufficient and concur with this court’s decision in this case.

. Johnson specifically addressed only Article 85(a)(1) offenses that involve an intent to remain away permanently. However, the.reasoning of the case would apply to an intent to shirk important service, although perhaps with less force.